UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

RASHARD JOLLY,

        Plaintiff,

v.                                               **ACTION NO. 4:16cv38**

NANCY A. BERRYHILL,[1]
Acting Commissioner of Social Security,

        Defendant.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Rashard Jolly ("Jolly") seeks judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claim for disability insurance benefits ("DIB") under Title II and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. Specifically, Jolly claims that the residual functional capacity ("RFC") formulated by the Administrative Law Judge ("ALJ") failed to account for the effects of his mental impairments; the ALJ asked the vocational expert ("VE") hypothetical questions that did not account for these limitations; and the ALJ relied on testimony that did not comport with the Dictionary of Occupational Titles ("DOT") or the limits he imposed. (ECF No. 12). This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure. For the reasons stated below, this Report recommends that the final decision of the Commissioner be affirmed.

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted in place of Carolyn W. Colvin as the defendant in this suit.

## I.  PROCEDURAL BACKGROUND

Jolly filed his current application for DIB and SSI on December 10, 2012, alleging that he was disabled as of August 3, 2011. (R. 112). Prior to the hearing he moved to amend his alleged onset date to June 5, 2013. (R. 30).[2] His application was denied initially, (R. 162-79), and upon reconsideration. (R. 162-79, 189-202). Jolly then requested an administrative hearing, which the ALJ held on August 18, 2015. (R. 28-46). On September 18, 2015, the ALJ concluded that Jolly was not disabled within the meaning of the Social Security Act and denied his claim for DIB and SSI. (R. 22). The Appeals Council then denied Jolly's request for review of the ALJ's decision (R. 1-4), thereby making the ALJ's decision the final decision of the Commissioner. Pursuant to 42 U.S.C. § 405(g), Jolly filed this action seeking judicial review of the Commissioner's decision. This case is now before the court on the parties' cross-motions for summary judgment.

## II.  FACTUAL BACKGROUND

Jolly was born in 1975 and was thirty-seven (37) years old on his amended disability onset date. (R. 30). Jolly's past work included brief service in the United States Army from which he received a medical discharge after three months of service. (R. 31). After his military service, Jolly worked as a forklift operator, laborer, tire mounter, and ditch digger. (R. 21). He has not worked since his disability onset date. In his current appeal, Jolly complains primarily of back and leg pain, and mental impairments. See Pl.'s Br. Supp. Mot. Summ. J. 7 (ECF No. 12).

Jolly received medical treatment and services through the Department of Veterans Affairs. With regard to the time period under consideration, the medical evidence of his mental

---

[2] Jolly had filed a total of three earlier applications, which had all been denied. His most recent previous denial alleged an onset date of November 23, 2007. That application proceeded to a hearing before an ALJ who denied the claim on August 20, 2011. (R. 17, 50-60). Jolly appealed the denial but did not pursue that claim in federal court.

health treatment[3] begins with a consultative exam by agency physician Asha Kohli, M.D., on July 24, 2013. (R. 699). Dr. Kohli observed that Jolly was clean, cooperative, and engaged, but also noticed behaviors suggestive of poor impulse control. (R. 697-98). Jolly's "stream of mental activity" was slow, but well organized. (R. 698). Jolly reported that he sometimes hears voices or knocking on the door, and that he has homicidal thoughts when he gets very angry. Id. Dr. Kohli observed that Jolly was depressed and very paranoid. (R. 697-98). As a result of this first consultative exam, Dr. Kohli opined that Jolly was able to understand, retain, and follow instructions, but that he would have social impairments and could not "tolerate the stress and pressure associated with day-to-day work." (R. 699). Jolly's Global Assessment of Functioning[4] ("GAF") was assessed at 50. Id.

On August 12, 2013, state agency psychologist Ken M. Wilson, Psy.D., conducted a review of Jolly's medical records. (R. 85). Dr. Wilson assessed that Jolly had mild difficulties in activities of daily living; moderate difficulties in social functioning and in maintaining concentration, persistence, or pace; and that he had no repeated episodes of decompensation. (R. 89-90). Dr. Wilson concluded that Jolly had "the mental capacity for the sustained performance of relatively simple routine repetitive tasks in relatively undemanding work settings that do not require intensive interpersonal relating. . . ." (R. 90).

---

[3] Because Jolly contests only the ALJ's assessment and accommodation of his mental limitations, this report will not review in detail the medical evidence related to his physical impairments. See, e.g., (R. 123-26, 691-95).

[4] Clinicians use the GAF scale, devised by the American Psychiatric Association and ranging from zero to one hundred, to indicate an overall judgment of a person's psychological, social, and occupational functioning. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000). A GAF of 71-80 indicates that "if symptoms are present, they are transient and expectable reactions to psycho-social stressors;" a GAF of 61-70 indicates that the individual has "some mild symptoms;" a GAF of 51-60 indicates that the individual has "moderate symptoms;" and a GAF of 41-50 indicates that the individual has "serious symptoms." Id. However, the DSM-5 abandoned the use of GAF scores as a diagnostic tool for assessing a patient's functioning because of the questionable probative value of such scores. Diagnostic and Statistical Manual of Mental Disorders (DSM-V) 16 (5th ed. 2013).

On October 30, 2013, Jolly reported to the Mental Health Outpatient Clinic ("MHC") at the Hampton VAMC for a preliminary treatment plan and was seen by Pejcharat Harvey, Ph.D. (R. 984). Dr. Harvey observed that Jolly was oriented, pleasant, and cooperative, but that he was paranoid and dysthymic. (R. 987). Jolly reported that he was having marital issues, that he believes people are conspiring against him, and occasionally hears "horror music" when he becomes angered or knocking on doors. (R. 987-88). Dr. Harvey noted a diagnosis of schizoaffective disorder and labeled Jolly as a moderate risk for suicidal behavior. (R. 989). Jolly was referred for an initial psychological evaluation and further treatment at MHC. (R. 990).

On November 7, 2013, state agency psychologist Daniel Walter, Psy.D., conducted a review of Jolly's mental health records. (R. 126-29). As of Jolly's DLI, June 30, 2013, Dr. Walter assessed that he was moderately limited in the ability to maintain concentration, work in coordination with others, interact with the public, and accept criticism from supervisors. (R. 128-29). Nonetheless, Dr. Walter's assessment of Jolly's current condition was that he was able to perform simple, routine, and repetitive tasks in a relatively undemanding work setting that did not require intensive interpersonal relationships. (R. 127).

On November 12, 2013, Jolly reported to MHC where he was seen by Kathryn Bieri, Psy.D., for an initial psychotherapy consult. (R. 953). At that time Jolly reported that he was experiencing ongoing symptoms of depression, and that he had a history of anger issues. (R. 954). Dr. Bieri observed that Jolly was appropriately groomed, pleasant, and cooperative. Id. She also observed that Jolly's thoughts were organized and goal directed, but noted that Jolly reported auditory hallucinations. (R. 955). Jolly was referred to further counseling.

On November 15, 2013, Jolly returned to Hampton VAMC General with apparent chest

4

pains. (R. 952-53). He also complained of difficulty sleeping due to nightmares and auditory hallucinations. (R. 953). Dr. Naheed Saleem increased his dosage of Seroquel, continued Jolly on Prozac and Trazodone, and directed him to go to the emergency room to address his chest pains. Id.

Jolly met again with Dr. Bieri on December 11, 2013, after missing a previously scheduled appointment on November 25. (R. 935-36). Jolly reported having a "bad" weekend because of a run-in with law enforcement and continued conflict with his wife. (R. 935). Dr. Bieri observed that he was appropriately groomed, oriented, and his thought process was normal. Id. Jolly denied, and there was no evidence of, mood, thought, or perceptual disturbances. Id.

On December 16, 2013, Jolly reported to the Hampton VAMC for medication management and a PTSD screening with Bogdan Ionescu, M.D. (R. 927). Dr. Ionescu observed Jolly to be oriented and cooperative with normal thought process. Id. Jolly's mood was dysphoric, and he complained of interpersonal issues, legal troubles, and an anger problem. Id. Jolly also reported having intermittent hallucinations. (R. 928). Dr. Ionescu noted a bipolar disorder diagnosis and positive screen for PTSD symptoms. (R. 928, 930). Jolly was continued on his medication, instructed to return to MHC for follow up mental health treatment, and referred for further PTSD evaluation. (R. 930).

On January 10, 2014, Jolly reported to MHC for individual psychotherapy with Dr. Bieri. Jolly was appropriately groomed and oriented, but reported feeling "down." (R. 923). He again denied, and there was no evidence of, mood, thought, or perceptual disturbances. Id. Jolly did report having "fleeting" suicidal ideation and referenced a vague plan to overdose on medication, but he denied present plans or past attempts. Id. He also denied homicidal ideation. Id. Dr. Bieri reviewed a suicide prevention plan with Jolly, and recommended continued counseling.

(R. 923-25).

Jolly reported to the Hampton VAMC on January 13, 2014, for his PTSD evaluation with Margaret Johnson, a Licensed Clinical Social Worker. (R. 918). Jolly was unable to complete the PTSD evaluation because he was "in crisis." (R. 919). Ms. Johnson observed that Jolly was alert, and that there was no evidence of any thought disorder, hallucinations, or delusions. (R. 918). Jolly reported that he did not have any imminent suicidal or homicidal intentions, but that he thought about dying on a regular basis and would often have auditory hallucinations that encouraged violence. Id. Jolly was then escorted to the emergency department where he was seen by David Tamayo, Psy.D. (R. 917). Dr. Tamayo observed that Jolly had vague suicidal ideations, but no imminent plans to cause harm to himself or others. Id. Jolly was also observed to be alert, cooperative, calm, pleasant, and conversant. (R. 918). Dr. Tamayo increased his doses of Fluoxetine and Seroquel, and Jolly was sent home without admission into the VAMC. Id.

On January 15, 2014, Jolly returned to the Hampton VAMC to complete his PTSD evaluation with Margaret Johnson. (R. 911). Ms. Johnson observed him to be anxious and depressed, but with fair judgment and good cooperation. (R. 913-14). Jolly reported the same auditory hallucinations and paranoid thoughts that he had shared in previous treatment sessions. (R. 913). She assessed that he was a high risk for suicidal behavior. (R. 914). Ms. Johnson concluded that Jolly did not meet the criteria for military related PTSD, and as a result, he was not recommended for enrollment in the PCT Clinic. Id. Jolly met with Margaret Johnson again on January 17 and 23, 2014. (R. 907, 909). In his January 23 session, Jolly reported that he was feeling more hopeful about his life and wanted to stay in counseling to maintain that sense of hope. (R. 908).

6

On January 27, 2014, Jolly participated in group therapy led by Dr. Harvey to address negative thinking and stress management. (R. 905). Dr. Harvey noted that Jolly was making progress towards his goals and actively participated in the 60 minute session. (R. 905-06). On January 31, 2014, Jolly returned to meet with Dr. Bieri for individual psychotherapy. (R. 902). Jolly reported that he was still experiencing anxiety and anger issues related to marital conflict, physical pain, and health concerns. (R. 903). He also reported continued paranoia and auditory hallucinations, but that he was less depressed and felt hopeful about life. Id.

On February 1, 2014, Jolly reported to the Hampton VAMC Emergency Department with complaints of vague suicidal ideation and depression. (R. 901). He was admitted to the hospital and remained there until February 7, 2014. (R. 701). Staff psychiatrist Armin Ansari, M.D., noted that upon his initial admission, Jolly reported that he was having paranoid thoughts about his wife cheating, which apparently led to a verbal/physical altercation. Id. He also endorsed visual and auditory hallucinations of a man in his house. (R. 702). Jolly told Dr. Ansari that he had attempted suicide in the past; once by taking too many sleeping pills and another time by trying to crash his car. Id. After admission, "[h]e progressed through the ward setting without any significant difficulties." Id. And while admitted, Jolly was placed on Risperdal and consistently denied having any suicidal or homicidal ideation. (R. 703).

Following his discharge, Jolly met with Dr. Bieri on February 11, 2014, for individual psychotherapy. (R. 798). Jolly reported being "up and down" since his discharge from the hospital and expressed ongoing stress from his marital and financial situation. (R. 799). He denied, and there was no evidence of any hallucinations. Id. He also denied having any suicidal or homicidal ideations. Id. Dr. Bieri recommended that Jolly consider a residential program, but Jolly declined the referral. Id. Jolly attended group therapy sessions on February 24 and 27,

2014, and his records indicate that he was alert, making progress towards his goals, and actively participated in the meetings. (R. 792, 797).

Jolly met with Dr. Bieri again on February 28, 2014, for individual psychotherapy. (R. 788). Dr. Bieri observed paranoid and frustrated behavior, but Jolly showed no signs of hallucinations or violent ideation. (R. 789). On the same day, Dr. Bieri completed a medical source statement for the purposes of Jolly's disability application. (R. 705, 789). Dr. Bieri indicated on the worksheet that if Jolly worked a full-time job, he would mentally decompensate and his GAF would fall below 50. (R. 705). She also indicated that Jolly has mild limitations in his ability to carry out simple instructions and making simple decisions; moderate limitations dealing with the public, coworkers, and supervisors; and marked limitations in maintaining concentration, pace, responding to changes in his routine, and dealing with normal work stress. (R. 706). Finally, she responded that Jolly would need more than four unscheduled breaks during a normal workday and would be absent more than four days a month due to his mental health problems. Id. Dr. Bieri could not answer whether these limitations were present as of Jolly's DLI because she had not been treating him since that date. Id.

Dr. Bieri saw Jolly again for individual psychotherapy on March 21, 2014, and reported that he was making progress towards his treatment goals. (R. 765). Jolly had attended two group sessions since his last individual appointment, and reported that they helped reduce his depressive symptoms. (R. 766). Jolly continued to report paranoid and anxious thoughts that were primarily related to on-going difficulties with his wife, although he stated they had not been fighting as much and he was making an effort to get out of the house more. Id. He denied any hallucinations or violent ideation. Id. Jolly subsequently attended several group sessions where it was often noted that he was active and making progress towards his treatment goals. (R. 745,

8

747-49, 760, 762, 763).

On April 1, 2014, Jolly reported to Dr. Ionescu for medication management and supportive psychotherapy. (R. 740). Jolly reported that he was feeling "low" and "taking it day by day." Id. He also reported that he was hearing voices at times, but denied suicidal or homicidal ideation. Id. Dr. Ionescu observed Jolly to be pleasant, cooperative, and alert with well-organized thoughts. Id. Jolly met with Dr. Bieri again on April 4, 2014, and reported that continuing marital conflict and his financial situation was weighing on him. (R. 737). He also expressed continued paranoia, but denied any hallucinations or violent ideation. (R. 738). At a group session on the same day, Jolly was observed to be an active participant and making progress towards his treatment goals. (R. 735-36).

Jolly was not seen again for individual psychotherapy until January 22, 2015, missing several appointments before that date. (R. 728-9, 732). During the January 22 meeting, Dr. Bieri observed that Jolly's thoughts continued to be marked with paranoid ideation. (R. 727). Jolly reported that he had experienced increased stress and anxiety over the past months due to deaths of friends and family, and that a recent trip to North Carolina had brought up difficult memories about childhood abuse he suffered. Id. He also reported continued marital conflict. Id. Dr. Bieri saw no evidence of hallucinations or violent ideation. Id. The next day he met with Dr. Ionescu for medication management. (R. 719). Jolly reported that he was feeling "down" due to his marital problems, and that he was seeing and hearing "ghosts and shadows at times." Id. Dr. Ionescu observed Jolly to be alert, cooperative, and experiencing no present hallucinations or delusions. Id.

Jolly was seen for individual psychotherapy with Dr. Bieri again on March 17, 2015, after missing an earlier appointment. (R. 714). Jolly reported continued stress stemming from

his marital issues and paranoia. (R. 715). Dr. Bieri informed Jolly that she was leaving Hampton VAMC, and Jolly agreed to continue attending group therapy and to a transfer of individual care. Id. Dr. Bieri did not see any evidence or hallucinations or violent ideation. (R. 716). Jolly's care was transferred to Dr. Harvey, and Jolly reported for his first individual therapy session on May 14, 2015 (R. 711). Dr. Harvey observed that Jolly remained paranoid and depressed. Id. Jolly denied any hallucinations or violent ideations. Id. Jolly met with Dr. Harvey again on June 4, 2015, and his mood remained dysthymic. (R. 709). Dr. Harvey also observed that Jolly's thoughts were still marked with paranoid ideations, but that he had no hallucinations or violent ideations. Id. Jolly's financial and marital situation remained the primary stressors in his life. Id.

At the hearing Jolly testified to his brief military service and the reasons for his discharge. (R. 31). He stated that he last worked for a few weeks in 2011, but that he couldn't climb ladders as required by the work because of problems with his knees and back. (R. 32). He stated that he had four children, but that he did not see them because they lived with their mothers. (R. 33). He acknowledged having been incarcerated multiple times, but could not recall what for. (R. 34).

With regard to his mental limitations, Jolly testified that was taking Prozac, which he described as a sleep aid, as well as Trazadone and Risperdal. He described side effects from his medication, including constipation, which was exacerbated by injuries he sustained in a 2007 motor vehicle accident. (R. 35). Jolly testified that he mostly sleeps during the day, though he is able to manage his self-care, picking up clothes and taking care of his personal hygiene. (R. 36-37). He stated that he occasionally went shopping with his wife, but that he did not like to be around people because it made him anxious. On examination by his attorney, Jolly stated that he

thought people were talking about him which gave him a nervous feeling.  (R. 40).  He stated that the medications he was taking were not helping, but making him more paranoid, and that he preferred to just be asleep by himself.  (R. 42).

After Jolly's testimony, the ALJ examined a Vocational Expert, Barbara Byers ("VE").  The VE first characterized Jolly's past work as a forklift operator, tire mounter, and ditch digger as either semi-skilled or unskilled at the medium to very heavy physical demand level.  (R. 43).  The ALJ then asked whether a hypothetical individual of Jolly's age, education and work experience, who had the capacity to do light work, limited as to climbing, pushing and pulling with lower extremities, and limited only to simple, repetitive, non-production job tasks without frequent interaction with co-workers or the general public would have jobs available.  The VE identified cafeteria attendant, folding machine operator, and marking clerk as light jobs available for an individual with such limitations.  (R. 44).  She also identified sedentary jobs of assembler and document preparer.  (R. 44).  On cross-examination Jolly's attorney asked the VE if a similarly limited person who also "can't tolerate the stress and pressure of day-to-day work" due to anger issues, frustration, and impulsiveness could perform those jobs.  The VE answered "no."  (R. 44).  Likewise, the VE testified that a worker's absence for more than four days per month, or general inability to deal with workplace stress would preclude all work.  (R. 44-45).

## III.    STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting

Consol. Edison Co. of New York v. NLRB, 305 U.S. 197, 229 (1938)).  It consists of "more than

a mere scintilla" of evidence, but may be somewhat less than a preponderance.  Laws v.

Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The court does not undertake to re-weigh conflicting evidence, make credibility

determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d

585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456.  "Where conflicting evidence allows

reasonable minds to differ as to whether a claimant is disabled, the responsibility for that

decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76

F.3d at 589.  The Commissioner's findings as to any fact, if supported by substantial evidence,

are conclusive and must be affirmed.  Perales, 402 U.S. at 390.  Thus, reversing the denial of

benefits is appropriate only if either the ALJ's determination is not supported by substantial

evidence on the record, or the ALJ made an error of law.  Coffman v. Bowen, 829 F.2d 514, 517

(4th Cir. 1987).

## IV.     ANALYSIS

To qualify for disability insurance benefits under sections 416(i) and 423 of the Social

Security Act, an individual must meet the insured status requirements of these sections, be under

the age of sixty-five, file an application for disability insurance benefits and a period of

disability, and be under a "disability" as defined in the Act.  42 U.S.C. §§ 416(i), 423.  The

Social Security Regulations define "disability" as the "inability to do any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months."   20 C.F.R. § 404.1505(a); see also 42 U.S.C. §§ 423(d)(1)(A),

416(i)(1)(A). To meet this definition, a claimant must have a "severe impairment" that makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a); see 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered in determining whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The five questions which the ALJ must answer are:

1. Is the individual involved in substantial gainful activity?

2. Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or her physical or mental ability to do the work activities?

3. Does the individual suffer from an impairment or impairments which meet or equal those listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (a "listed impairment" or "Appendix 1")?

4. Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

5. Does the individual's impairment or impairments prevent him or her from doing any other work?

An affirmative answer to question one, or a negative answer to question two or four, results in a determination of no disability. An affirmative answer to question three or five establishes disability. This analysis is set forth in 20 C.F.R. §§ 404.1520, 416.920. The burden of proof and production rests on the claimant during the first four steps, but shifts to the Commissioner on the fifth step. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).

When conducting this five-step analysis, the ALJ must consider: (1) the objective medical facts; (2) the diagnoses and expert medical opinions of the treating and examining

physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age. Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967) (citing Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962)). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. Hays, 907 F.2d at 1456.

## A.    The ALJ's Decision

In this case, after first finding that Jolly met the insured status requirements of the Social Security Act through June 30, 2013, the ALJ made the following findings under the five-part analysis: (1) Jolly had not engaged in gainful activity since his alleged onset date of June 5, 2013; (2) he had severe impairments of schizoaffective disorder, depression/bi-polar and status post-fracture of the lower extremity; (3) he did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments in Appendix 1; and (4) he had the RFC to perform light work activities with the following limitations: He could have no frequent interaction with coworkers and the public; he could perform simple, routine, repetitive, non-production job tasks; and he had to avoid climbing and any pushing or pulling using the lower extremities. (R. 16-21). At step five, relying on the VE's testimony, the ALJ concluded that jobs which Jolly can perform exist in significant numbers in the national economy. (R. 22).

In making his RFC determination and finding of no disability, the ALJ first observed that Jolly's previous applications had all followed the diagnoses which underpinned his existing claim. He then discussed the evidence supported by the medical record, but gave little weight to the more recent consultative exams and a report from Jolly's treating psychiatrist, Dr. Bieri, because they were based too heavily on Jolly's subjective statements and inconsistent with his treatment history, activities of daily living, and longitudinal medical record. (R. 18). The ALJ

14

also found that Jolly's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [his] statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely credible" for reasons he described in his RFC analysis. (R. 17).

Jolly advances two arguments urging the court to reverse or vacate the Commissioner's decision.   First, he argues that the ALJ's RFC did not account for his deficits in social functioning, concentration, persistence, and pace of activity in a work setting, caused by his mental impairments.  Pl.'s Mem. Supp. Mot. Summ. J. 7-13 (ECF No. 12).  Second, he argues that the VE's testimony regarding jobs available to him is inconsistent with the RFC limiting him to non-production tasks, and that the ALJ did not explain these alleged differences. Id. at 13-17. This report examines each argument and recommends that the court find that the ALJ's decision was supported by substantial evidence because the ALJ did not err in assessing Jolly's RFC, and properly relied on the VE's testimony and the occupational definitions in the DOT.

## B.   The ALJ Properly Accounted for Jolly's Mental Impairments When Making His RFC Determination

Jolly first contends that the ALJ's RFC failed to account for his limitations in social functioning, concentration, persistence, and pace of activity in the work setting. Pl.'s Mem. Supp. Mot. Summ. J. 7-12 (ECF No. 12).  Relying primarily on the Fourth Circuit decision in Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015), Jolly argues the RFC did not sufficiently accommodate his difficulty functioning in a work setting.  Specifically, he claims the non-exertional limitations are inadequate to account for his ability to maintain concentration, stay on task during the workday, and interact with supervisors.

An RFC is the plaintiff's maximum ability to work despite his impairments.  20 C.F.R. § 404.1545(a)(1); see Social Security Ruling 96-9p, 1996 WL 374185 (July 2, 1996) ("RFC is the

individual's maximum remaining ability to perform sustained work on a regular and continuing basis."). When, as is the case here, a plaintiff's impairments do not meet or equal a listed impairment under step three of the sequential analysis, the ALJ must determine the plaintiff's RFC. 20 C.F.R. 404.1520(e). At step four, the ALJ then determines whether the plaintiff can perform his past relevant work. Id. § 404.1545(a)(5)(i). If the ALJ determines that the plaintiff cannot perform any relevant past work, as was the case for Jolly, the ALJ uses the RFC at step five to determine if the plaintiff can "adjust to any other work that exists in the national economy." Id. § 404.1545(a)(5)(ii).

The ALJ is responsible for determining a plaintiff's RFC at the administrative hearing level, and in making this determination, the ALJ considers all of the relevant medical and other evidence[5] in the record. Id. §§ 404.1527(b), 404.1545(a)(3), 404.1546(c). "[R]elevant evidence . . . includ[es] information about the individual's symptoms and any 'medical source statements' – i.e., opinions about what the individual can still do despite his or her impairment(s) – submitted by an individual's treating source or other acceptable medical sources." SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

Here, the ALJ determined that Jolly has the RFC to perform light work involving the performance of simple, repetitive, non-production tasks with added limitations on climbing, and interaction with co-workers and the general public. (R. 16). Jolly contends that the ALJ's RFC did not adequately account for his mental impairments. Specifically, he argues that the ALJ ignored evidence that Jolly would be unable to interact with supervisors or sustain the pace of full-time work. See Pl.'s Mem. Supp. Mot. Summ. J. 7-12 (ECF No. 12). He primarily relies

---

[5] "Other evidence" includes "statements or reports from [the claimant], [the claimant's] treating or nontreating source, and others about [the claimant's] medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how ... how impairment(s) and any related symptoms affect [the claimant's] ability to work. 20 C.F.R. § 404.1529(a).

upon the Fourth Circuit's holding in Mascio.

In Mascio, the Fourth Circuit held that the ALJ had not accounted for the claimant's moderate limitations in concentration, persistence and pace or social interaction merely by limiting the claimant to unskilled work. 780 F.3d at 635. Unless the residual functional capacity assessment includes a narrative discussion describing why the moderate limitation did not produce functional limits on the ability to work, those limits need to be addressed by the RFC. Id. at 636 (quoting Social Security Ruling 96-8p). When the ALJ does fashion an appropriately limited RFC or performs an explicit function-by-function analysis to explain why additional limitations are not needed, the dictates of Mascio are satisfied. Id. (quoting Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)); Watson v. Colvin, No. 2:15cv407, 2016 WL 4154920 *1, *3 (E.D. Va. 2016) (citing cases since Mascio).

Here, the ALJ properly examined the evidence in the record and discussed the weight he gave to the evidence, and specifically assigned "little weight" to the opinions Jolly now relies upon. Moreover, Jolly's RFC included not only a limitation to simple, repetitive tasks, but also limitations on interactions with supervisors and general public, and a limit to non-production tasks. (R. 16); see also Baker v. Colvin, No. 3:15cv00637, 2016 WL 3581859 at 3 (E.D. Va. June 7, 2016) (collecting cases holding limitation to non-production work may satisfy Mascio).

With regard to Jolly's mental impairments, the ALJ discussed Jolly's own testimony, as well as mental status examinations he received from various providers in 2013. The ALJ first noted that in the prior unfavorable determination from 2011 – which was not appealed – Jolly was found to have a similar physical capacity for work, and limited non-exertionally to occasional interaction with the public and simple routine tasks. (R. 15, 54). Although Jolly argued that his condition had significantly deteriorated since then, the ALJ found that the GAF

scores and medical opinions he relied upon were not sufficient to meet his burden to prove disability.

He acknowledged that Dr. Bieri, one of Jolly's treating psychologists, imposed marked restrictions on Jolly's ability to work regularly or deal with normal work stress. But he specifically assigned her opinion little weight. He called Dr. Bieri's assessment "too severe," and inconsistent with the claimant's treatment history and activities of daily living. Specifically, he cited Jolly's functional reports which variously stated that he could manage his own finances, prepare light meals, use public transportation, and shop in stores. (R. 291-292). He also conducted a detailed review of Jolly's mental health treatment during the relevant time period, noting that his complaints during treatment were primarily related to marital difficulties with his wife and financial stress. (R. 19, 903, 766, 737, 715). The ALJ also correctly characterized the extensive history of Jolly's group therapy, noting that while Jolly endorsed paranoid feelings and an anxious or depressed mood, he also consistently demonstrated a logical thought process, behaved and appeared appropriately, and participated regularly in group sessions. Although Jolly reported "hearing things," such as "Bob Barker's voice saying 'The Price is Right,'" (R. 903) he was never observed to be cognitively impaired or actively hallucinating. (R. 19) (citing Exhibit B10F at R. 707 – 1001). Dr. Bieri treated Jolly for a portion of the time covered by this extensive record, but Jolly also treated with several other therapists and medical providers whose observations of Jolly's condition constitute the longitudinal record the ALJ relied upon. Based on this review of the medical record, the ALJ did not err in assigning little weight to this single opinion from one of Jolly's treating providers.

The ALJ also gave little weight to the Consultative Examiner, Dr. Kohli, who concluded that Jolly could not tolerate the stress and pressure of day-to-day work because of impulsiveness,

anger issues, and frustration. (R. 18). The ALJ explicitly noted the fact that the opinion was based on a single, one-time exam and, in the ALJ's view, over-relied on Jolly's subjective complaints which the ALJ found inconsistent with the medical evidence of record, including Jolly's extensive history of group therapy. (R. 18). Specifically, he observed that record revealed Jolly had been inconsistent in reporting side effects of his medications, and generally stated to his providers that group therapy was helpful to him because it helped him deal with his social anxiety. (R. 19, 766, 903). The ALJ's review was also supported by accurate citation to individual pages of Jolly's nearly 300-page record of treatment at the VA. He noted that his review of this longitudinal record was more consistent with the two agency psychological consultants who also reviewed Jolly's treatment history. Both at the initial and reconsideration level these Ph.D.-level specialists concluded that Jolly retained the ability to perform simple routine tasks in a relatively undemanding work setting, with minimal interaction with the public. Consultative Report of Dr. Ken Wilson. (R. 106); Consultative Report of Dr. Daniel Walter. (R. 149). Based on their consistency with the record as a whole, the ALJ assigned both these medical source opinions significant weight. As shown by the ALJ's analysis, he discussed the evidence presented in the record and fashioned an RFC that accounted for Jolly's functional limitations which was supported by substantial evidence in that record. See (R. 17-21). Where medical evidence conflicts, it is the ALJ's job to assess that evidence in the context of the claimant's allegations and determine the work-related limitations imposed by his impairments. King v. Califano, 599 F.2d 597, 599 (4th Cir. 1997); Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976).

In addition, unlike the plaintiff in Mascio, Jolly's RFC included specific, detailed limitations to accommodate his mental impairments. For example, the RFC limited him to

"performing simple, routine, repetitive non-production job tasks without frequent interaction with co-workers and the general public." (R. 16). His RFC not only considered all of the evidence – both physical and mental symptoms – but also properly accounted for any impairments supported by the record. Accordingly, the undersigned finds that the ALJ's RFC was supported by substantial evidence.

**C.    The VE's Testimony was Consistent with the Dictionary of Occupational Titles and is Sufficient Evidence to Meet the Commissioner's Burden at Step 5.**

Jolly's second argument is that the ALJ relied on testimony from the VE that did not align with his RFC, and the ALJ did not explain these differences. (ECF No. 12, at 23-26). The VE's testimony was necessary because Jolly could not perform any of his past work, and thus the burden shifts to the Commissioner to establish that there is work in significant numbers in the national economy which Jolly could perform. Guiton v. Colvin, 546 Fed. App'x 137, 141 (4th Cir. 2013). The Fourth Circuit, in an opinion issued after the ALJ's decision in Jolly's case, clarified the degree of precision necessary when VE's testimony and job descriptions in the DOT are alleged to conflict. See Pearson v. Colvin, 810 F.3d 204 (4th Cir. 2015).

In Pearson, the Fourth Circuit concluded that the ALJ must independently identify and explain conflicts when "the vocational expert's testimony apparently conflicts with the D[OT]." Id. at 211. The ALJ should then resolve the inconsistency with help from the VE's testimony. Id. In reaching this conclusion, the Fourth Circuit discussed Social Security Ruling 00-4p, which "require[s] the ALJ (not the vocational expert) to '[i]dentify and obtain a reasonable explanation' for conflicts between the vocational expert's testimony and the Dictionary [DOT], and to '[e]xplain in the determination or decision how any conflict that has been identified was resolved.' " Id. at 208 (citing Social Security Rule 00-4p, 2000 WL 1898704 (Dec. 4, 2000)) (emphasis in original). Thus, the ALJ must first ask the VE if the evidence she provides

20

conflicts with the DOT, and second the ALJ "must 'obtain a reasonable explanation for . . . [any] apparent conflict.'"  Id.  The Fourth Circuit emphasized that

> this second requirement is so independent of the first that it does not rest on the vocational expert's identification of a conflict[;] [r]ather, SSR 00-4p directs the ALJ to "resolve the conflict by determining if the explanation given by the [expert] is reasonable," and to "explain the resolution of the conflict <u>irrespective of how the conflict was identified.</u>"

Id. (emphasis in original).  In so holding, the Fourth Circuit clarified that certain conflicts must be explained even if neither the claimant nor the VE points them out during the hearing.  But in defining which conflicts require this affirmative explanation the court rejected the standard proposed by the claimant – to explain all "possible" conflicts – and the standard proposed by the Commissioner – to explain only "obvious" conflicts.  Id. at 209-10 Instead, the court struck a middle ground requiring explanation of conflicts that are "apparent."  Id. at 209.  "The 'apparent' conflict standard . . . embraces the reality that, in many cases, testimony may only <u>appear</u> to conflict with the D[OT], and the vocational expert may be able to explain that, in fact, no conflict exists."  Id. (emphasis in original).  If the VE does not explain the apparent conflict, "the expert's testimony cannot provide substantial evidence to support the ALJ's decision."  Id.

In this case, when responding to the ALJ's hypothetical, the VE identified five different jobs which she stated that Jolly could perform given the RFC outlined in the ALJ's hypothetical: cafeteria attendant, folding machine operator, marking clerk, assembler, and document preparer. (R. 43-44).  The ALJ then asked the VE, "Do all these jobs comport with the Dictionary of Occupational Titles?"  The VE answered "Yes, sir."  (R. 44).  Neither the ALJ nor Jolly's counsel asked any additional questions about the VE's testimony with regard to consistency with the DOT.

Jolly now argues that the positions identified by the VE would require him to engage in

work that conflicts with the ALJ's RFC and hypothetical.   For example, position number 208.685-014, a folding machine operator, is described by the DOT as follows:

> Tends machine that folds advertising literature, forms, letters, or other paper sheets. Turns indicator knobs to adjust folding rollers, side guides, and stops, according to specified size and number of folds.  Starts machine and feeds paper sheets between folding rollers.  Removes folded sheets.  May place folded sheets into envelopes preparatory to mailing.

DICOT 208.685-014 (G.P.O.), 1991 WL 671754

Jolly contends this position is production based and not consistent with the RFC's limit to non-production positions.  But the DOT description does not state that the position is production based, and Jolly's counsel did not inquire regarding his apparent perception that tending a machine necessarily – or apparently – involved a production task.   Although the term is not specifically defined in the DOT, production jobs generally involve piecework with quotas or assembly line work involving a rapid pace of material handling.  See Bryan-Tharpe v. Colvin, No. 1:15cv272, 2016 WL 4079532 *2-3 (M.D. N.C. July 29, 2016) (discussing non-production limits being directed to the pace of work activity).

In addition, even if this job is deemed to conflict, the VE also identified other positions which do not conflict with Jolly's limitations.  For example, the cafeteria attendant, DOT No. 311.677-010, and marking clerk, DOT No. 209.587-034, were both identified as additional jobs available to Jolly.  (R. 22, 44).  The cafeteria attendant position "carries trays from food counters to tables for cafeteria patrons.  Carries dirty dishes to kitchen.  Wipes tables and seats with dampened cloths.  Sets tables with clean linens, sugar bowls, condiments.  May wrap clean silver in napkins.  DICOT 311.677-010 (L.G.P. O.) 1991 WL 672694.  The position of marker "marks and attaches price tickets to articles of merchandise to record price and identifying information."

Neither of these two positions conflict with the RFC limits imposed by the

22

Commissioner. Although Jolly has generally argued that the cafeteria attendant would violate the restriction involving frequent contact with the public, it is not "apparent" from the DOT description that the VE's estimate of available jobs conflicts. First, the ALJ did not state that Jolly could not work "around" members of the general public, as his attorney argues in his brief. Rather, his RFC limits him to positions that do not require frequent "interaction" with coworkers or the general public. Second, the attendant position as described by the DOT appears to encompass a variety of tasks, most of which involve virtually no public or co-worker interaction. As a result, there is no apparent conflict with the DOT description.

With respect to the position of marking clerk, Jolly has not asserted that the position is outside the RFC limits, only reiterating the arguments that the limits are insufficient to account for his impairments. Pl.'s Mem. Supp. Mot. Summ. J. 17 (ECF No. 12). Standing alone the VE's testimony that marking clerk positions existed in substantial numbers in the national economy is substantial evidence on which to sustain the Commissioner's finding regarding available work. (R. 22, 44, describing 200,000 marking clerk positions nationally); See Guiton, 546 Fed. App'x at 142 (citing Hicks v. Califano, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979)) (suggesting 110 jobs in claimant's state was a significant number of jobs).

As this review of the testimony demonstrates, some of the positions described by the VE do fit within the RFC limits found by the ALJ. Any "apparent" conflicts between the DOT requirements for the positions and Jolly's RFC limits do not undermine her testimony as substantial evidence to support the ALJ's finding. Accordingly, the ALJ did not err in relying upon it

## V. <u>RECOMMENDATION</u>

For the foregoing reasons, the undersigned recommends that the court GRANT the

Commissioner's Motion for Summary Judgment (ECF No. 13), DENY Jolly's Motion for Summary Judgment (ECF No. 11), and AFFIRM the decision of the Commissioner.

## VI. REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. See Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2. A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia

July 13, 2017

24